UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| J.Y. and G.T.,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>Defendant. | Case No. 26-cv-11173<br><br>Honorable Robert J. White |

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

I. Introduction

J.Y. and G.T. – a parent and minor child – commenced this action against Blue Cross Blue Shield of Michigan ("BCBSM") to recover improperly denied benefits under J.Y.'s employer-sponsored health plan. The complaint alleges that BCBSM should have covered G.T.'s treatment at an out-of-network mental health treatment facility without preapproval.

Before the Court is BCBSM's motion to dismiss the complaint. (ECF No. 12). J.Y. and G.T. responded in opposition. (ECF No. 14). BCBSM filed a reply. (ECF No. 16). The Court will decide the motion without a hearing pursuant to E.D. Mich LR 7.1(f)(2). For the following reasons, the motion is granted.

## II. Background

### *A. Factual History*

J.Y. is a participant in an employer-sponsored health plan. (ECF No. 1, PageID.1). BCBSM administers and insures all the claims and benefits under the plan. (*Id.*, PageID.3, ¶ 14). In 2023, J.Y.'s then-minor child, G.T., suffered from serious mental health conditions, including Attention-Deficit Hyperactivity Disorder, anxiety, depression, panic attacks, insomnia, and ideations of self-harm. (*Id.*, PageID.6, ¶ 29). When G.T.'s condition worsened, J.Y. admitted her to Summit Achievement, an out-of-network residential care facility located in Maine. (*Id.*, PageID.1,7, ¶ 33). J.Y. chose Summit because it was a long-term residential care facility that services minors exclusively and could treat G.T.'s conditions. (*Id.*, PageID.7, ¶ 33). Summit, however, is an out-of-network, nonparticipating provider. (*Id.*, ¶ 34).

G.T. received treatment at Summit from April 11 through June 13, 2023. (*Id.*, ¶ 35). She also underwent psychological testing with Todd Corelli, Ph.D. (*Id.*, ¶ 36). J.Y. claims that the testing "indicated certain therapeutic modalities" that could improve G.T.'s functioning. (*Id.*, ¶ 37). And G.T.'s condition improved to where she "developed certain skills and coping strategies that improved [her] functioning." (*Id.*, PageID.8, ¶ 39).

After G.T.'s discharge, Summit and Dr. Corelli submitted their claims to BCBSM. (*Id.*, ¶ 41). In an explanation of benefits, BCBSM rejected Summit's claims on the ground that the facility is an out-of-network, nonparticipating provider. (*Id.*, ¶¶ 42-43). And it paid Dr. Corelli's claims up to an "approved amount," leaving J.Y. on the hook for the remaining charges. (*Id.*, PageID.8-9, 14 ¶¶ 44-45, 68). A series of administrative appeals proved unsuccessful. (*Id.*, PageID.9-13, ¶¶ 46-57, 64-67).

### *B. Procedural History*

J.Y. and G.T. (the "Claimants") filed this lawsuit, alleging a cause of action to recover unlawfully withheld plan benefits under the Employee Retirement Income Security Act ("ERISA") as well as violations of the Mental Health Parity and Addiction Equity Act (the "Parity Act"). (ECF No. 1, PageID.14-17, ¶¶ 72-86). The complaint seeks, among other things, the recoupment of J.Y.'s out-of-pocket expenses and a declaration that BCBSM violated the Parity Act. (*Id.*, PageID.17-19). BCBSM now moves to dismiss the complaint in its entirety. (ECF No. 12).

## III. Legal Standards

When reviewing a motion to dismiss the complaint for failing to state a claim, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true." *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) (cleaned up); *see also* Fed. R. Civ. P. 12(b)(6). "The factual allegations

in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead sufficient factual matter to render the legal claim plausible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quotation omitted). In deciding this motion, the Court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## IV. Analysis

### *A. Denial of Health Benefits*

ERISA authorizes participants and beneficiaries in a covered health plan to recover the benefits due to them "under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B). Under the statute, an administrative denial of benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013). Absent "a clear grant of discretion to the administrator to determine benefits or interpret the plan" the appropriate standard of review is *de novo*. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc) (cleaned up).

"In determining whether benefits are due under the Plan, the starting point is the language of the Plan itself." *Adams v. Anheuser-Busch Cos.*, 758 F.3d 743, 746 (6th Cir. 2014) (cleaned up); *see also Farhner v. United Transp. Union Discipline Income Protection Program*, 645 F.3d 338, 343 (6th Cir. 2011). "[T]he plain language of an ERISA plan should be given its literal and natural meaning." *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997).[1]

1. Residential Treatment Services

Whether the plan's terms cover Summit's services is a straightforward question. The parties do not dispute that J.Y. was a participant in the Simply Blue HRA Group Benefits Plan. (ECF No. 12-2; *see also* ECF No. 12, PageID.90 n.2). The plan states expressly that "BCBSM does not pay for nonemergency services at nonparticipating . . . psychiatric residential treatment facilities." (ECF No. 12-2, PageID.260). And the complaint acknowledges that Summit is an "intermediate residential inpatient treatment" facility located in Maine, and that it "was not a participating provider under the Plan." (ECF No. 1, PageID.1, 7, ¶¶ 34-35). So the Claimants cannot plausibly establish their entitlement to health benefit coverage under the plan's terms.

[1] The parties' failure to supply the Court with the administrative record does not pose a barrier to deciding BCBSM's motion. Because the plan does not clearly grant discretionary interpretive authority to the administrator, the Court will review and interpret the plan document *de novo*. (ECF No. 12-2).

The Claimants contest this result anyway. They maintain that Summit should be considered an in-network provider because the plan lacked any participating residential facilities that could treat G.T.'s condition appropriately. (ECF No. 1, PageID.7, 9, ¶¶ 32, 47).

Now, granted, the plan does cover psychiatric residential treatment services that are provided "by a facility that participates with BCBSM (if located in Michigan) or with its local Blue Cross/Blue Shield plan (if located outside of Michigan)," so long as the service "has been *preapproved* by BCBSM or its representative." (ECF No. 12-2, PageID.161) (emphasis added). But the plan does *not cover* the "admission" or "services" rendered in "a psychiatric residential treatment facility" – like Summit – that is "located outside of Michigan" and "does not participate with its local Blue Cross/Blue Shield plan." (*Id.*). And while there are "limited circumstances" when "[s]uch services may be payable," "BCBSM or its representative" must preapprove those services "before they occur." (*Id.*). Otherwise, the nonparticipating facility may require the plan participant "to pay for the admission and services." (*Id.*).

Here, the Claimants concede that (1) Summit is not a participating plan provider, and (2) J.Y. did not obtain preapproval from a BCBSM representative before admitting G.T. to Summit for treatment. (ECF No. 1, PageID.7-8, ¶¶ 32-35,

41; ECF No. 14, PageID.346-47). So the Claimants are not entitled to reimbursement for those services under the "limited circumstances" exception.

The Claimants' second theory of recovery is equally meritless. They now assert (for the first time in their response brief) that Summit's services are compensable under the plan's "Case Management Program." (ECF No. 14, PageID.350-51). That program is "designed to help manage the health care of members with acute or chronic conditions." (ECF No. 12-2, PageID.290). The plan describes the program in the following terms:

> In certain circumstances, BCBSM may find it necessary to pay for services that are generally not covered by your contract but that are medically necessary to treat your condition. When this occurs, a case management contract must be signed by you (or your representative), your provider and the BCBSM case manager. This contract will define the services *that will be covered* under the case management program.

(*Id.*) (emphasis added).

When behavioral health services are rendered pursuant to a case management agreement, the member pays "their in-network cost share even if the provider is out-of-network and/or does not participate with BCBSM." (*Id.*, PageID.159). The problem for the Claimants is that participation in the program rests in BCBSM's sole discretion (*Id.*, PageID.290). And BCBSM must approve any "[n]oncontractual services that are described in [the] case management treatment plan." (*Id.*, PageID.268).

Since BCBSM never (1) decided whether G.T.'s condition qualified for the program, or (2) approved the noncontractual services that Summit provided to G.T., the plan's "Case Management Program" does not either support the Claimants' attempt to recover unpaid health benefits.

2. Dr. Corelli's Testing

Next, the Claimants argue that BCBSM underpaid for Dr. Corelli's out-of-network psychological testing. (ECF No. 14, PageID.352).

The parties do not contest that Dr. Corelli is an out-of-network, nonparticipating provider. (ECF No. 1, PageID.9, ¶ 45). For services rendered by such providers, the plan authorizes BCBSM to pay the member the difference between the "approved amount" and the member's "out-of-network cost share." (ECF No. 12-2, PageID.257). The member is then responsible for the remaining portion of the out-of-pocket cost for the services provided. The plan defines the "approved amount" as "[t]he lower of the billed charge or our maximum payment level for the covered service." (*Id.*, PageID.287). And it defines the "maximum payment level" for nonparticipating or out-of-network providers as "the amount BCBSM pays for the service to its participating or in-network providers or the amount BCBSM negotiates with the nonparticipating or out-of-network provider." (*Id.*, PageID.303).

Based on this computation, the complaint does not plausibly allege how BCBSM could have miscalculated the "maximum payment level" to underpay Dr. Corelli. Since BCBSM was not aware of Dr. Corelli's services before he tested G.T., it could not have negotiated his rates beforehand. And the other alternative – paying Dr. Corelli "the amount BCBSM pays for the service to its participating or in-network providers" – reflects a *predetermined* contractual sum that is unrelated to the testing services Dr. Corelli actually performed. Using either computation, then, the Claimants' assertion that BCBSM underpaid Dr. Corelli is implausible.

Because the Claimants are not entitled to reimbursement for Summit's residential treatment services or Dr. Corelli's out-of-network psychological testing, their cause of action to recover unpaid health benefits under ERISA must be dismissed.

*B. The Parity Act*

Congress enacted the Parity Act "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016). Among other things, the statute amended ERISA to prohibit group health plans, that provide "both medical and surgical benefits and mental health or substance use disorder benefits," from imposing "treatment limitations applicable to

such mental health or substance use disorder benefits" that are "more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(a)(3)(A)(ii). The law also forbids plans from mandating "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." *Id.*

Although the United States Court of Appeals for the Sixth Circuit has yet to decide whether the Parity Act authorizes a private right of action, the First and Tenth Circuits have both assumed (due to litigating party concessions) that it does. *See E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1281 (10th Cir. 2023); *N.R. v. Raytheon Co.*, 24 F.4th 740, 749 n.3 (1st Cir. 2022); *see also T.E. v. Anthem Blue Cross & Blue Shield*, 165 F.4th 971, 986 (6th Cir. 2026) ("Indeed, we have not even accepted that there is a private cause of action to enforce the Parity Act").

Running with this assumption, the Tenth Circuit has articulated the clearer test for evaluating Parity Act violations at the motion-to-dismiss stage. In *E.W. v. Health Net Life Ins. Co.*, the Tenth Circuit held that a Parity Act claim requires plausible allegations (1) that the statute governs the relevant group health plan, (2) that identify a specific treatment limitation on mental health or substance-use disorder benefits, (3) that identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits, and (4) that identify a disparity between the treatment limitation on mental health or

substance-use disorder benefits as compared to the limitations that the plan imposes on the medical or surgical analogue. *Id.* at 1283.

A Parity Act violation may take the form of a facial or as-applied challenge. *Id.* at 1284. Facial challenges attack the plan's disparate terms. *Id.* In this regard, the "plaintiff must identify an express limitation on benefits for mental health or substance use disorder treatment and demonstrate a disparity compared to benefits for the relevant medical or surgical analogue." *Id.* As-applied challenges "focus on treatment limitations that a plan applies in operation." *Id.* (quotation omitted).

The Claimants mount both facial and as-applied challenges. The facial challenge is relatively simple. They argue that the plan imposes a preapproval requirement on out-of-network psychiatric residential treatment facilities without imposing a corresponding limitation on out-of-network skilled nursing facilities. (ECF No. 14, PageID.355; *see also* ECF No. 1, PageID.6, ¶ 25). That contention is incorrect.

The plan states that BCBSM will pay for admission to a "participating skilled nursing facility" only where the plan member's physician provides BCBSM with "written confirmation indicating that skilled care is needed." (ECF No. 12-2, PageID.226). Although this language does not exactly mirror the preapproval formula for psychiatric residential treatment (*compare with* PageID.161), the effect is the same: BCBSM must approve the skilled nursing facility services before paying

for them. And a physician's "written confirmation" of medical necessity is what triggers the approval.

The Claimants' as-applied challenge, although more complex, does not fare any better. They maintain (again, for the first time in their response brief) that a lack of adequate in-network psychiatric residential treatment facilities – as opposed to in-network skilled nursing facilities and hospices – (1) fosters a "network disparity," that (2) forces plan members to more frequently opt for treatment at out-of-network psychiatric residential treatment facilities, and which (3) increases the likelihood that BCBSM will issue "more frequent denials" for services rendered at out-of-network psychiatric residential treatment facilities than out-of-network skilled nursing facilities and hospices. (ECF No. 14, PageID.355). This contention is flawed in several respects.

*First*, the complaint says that "J.Y. found that the Plan had only three participating intermediate residential inpatient providers." (ECF No. 1, PageID.7, ¶ 32). But it omits any allegation about the comparable number of in-network skilled nurse facilities and hospices. So there is no factual basis from which to draw a plausible inference that a "network disparity" actually exists.

*Second*, even assuming the existence of a "network disparity," such an incongruence does not alone constitute a "treatment limitation." The Parity Act defines that term to include "limits on the frequency of treatment, number of visits,

days of coverage, or other similar limits on the scope or duration of treatment." 29 U.S.C. § 1185a(a)(3)(B)(iii). The statute's accompanying regulations provide that "nonquantitative treatment limitations" include:

> [s]tandards related to network composition, including but not limited to, standards for provider and facility admission to participate in a network or for continued network participation, including methods for determining reimbursement rates, credentialing standards, and procedures for ensuring the network includes an adequate number of each category of provider and facility to provide services under the plan.

29 C.F.R. § 2590.712(c)(4)(ii)(D). "Nonquantitative treatment limitations" also include "[r]estrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan." *Id.* at § 2590.712(c)(4)(ii)(H).

The complaint, however, does not plausibly trace the purported "network disparity" to BCBSM's implementation of any of the above standards or restrictions. Nor do the Claimants allege – in a nonconclusory fashion – that any imbalance resulted from BCBSM's employment of more stringent "processes, strategies, evidentiary standards, or other factors used in designing and applying [a] nonquantitative treatment limitation to" psychiatric residential treatment facilities than those it employed with respect to skilled nursing facilities and hospices. *Id.* at § 2590.712(c)(4)(i)(A); *cf. Stephen T. v. Blue Cross and Blue Shield of Massachusetts*, No. 24-12829, 2026 U.S. Dist. LEXIS 165268, at *30 (D. Mass. Jul.

20, 2026) (holding that "[a] comparison of available intermediate inpatient behavioral health facilities to available hospice, rehabilitation, and skilled nursing facilities, without more evidence in the record to demonstrate that the requirements for coverage were applied differently" is insufficient to prevail on a Parity Act claim).

*Third*, the existence of an alleged "network disparity" does not necessarily raise a plausible inference that BCBSM is more likely to deny claims for services rendered at out-of-network psychiatric residential treatment facilities than out-of-network skilled nursing facilities and hospices. Perhaps the opposite effect is more probable. Knowing that a failure to comply with the plan's requirements could lead to steep out-of-pocket expenses, claimants might very well take the contrary approach and adhere more conscientiously to those procedures. This risk-avoidant strategy would then *diminish* the likelihood that BCBSM will deny claims for services rendered at out-of-network psychiatric residential treatment facilities. So, in the end, the Claimants' "network disparity" theory is too speculative to be plausible.

*Lastly*, the Claimants' reliance on *Brady K. v. Health Care Serv. Corp.*, No. 25-759, 2025 U.S. Dist. LEXIS 188775 (N.D. Ill. Sep. 25, 2025) is misplaced. (ECF No. 14, PageID.356). There, the district court never endorsed the view that a "network disparity" may alone supply the exclusive grounds for a Parity Act

violation. Instead, the court skirted the question because the plaintiff drew an express connection between the "disparity in coverage" and the process of adopting the "nonquantitative treatment limitations" at issue in that case. *Id.* at *17.

The current complaint fails to meet this threshold. Unlike the *Brady K.* plaintiff, the Claimants do not link the purported "network disparity" to specific "processes, strategies, evidentiary standards, or other factors used in designing and applying [a] nonquantitative treatment limitation" to psychiatric residential treatment facilities. 29 C.F.R. § 2590.712(c)(4)(i)(A). And without that connection, the Parity Act allegations cannot measure up to those asserted in *Brady K*.

Because the Claimants' facial and as-applied challenges are both implausible, the Parity Act claim must be dismissed.

*C. Amendment*

To thwart dismissal, the Claimants request leave to amend the complaint to include more detailed factual allegations concerning Dr. Corelli's underpayment and their "network disparity" theory. (ECF No. 14, PageID.352, 356). That avenue is now foreclosed.

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a pleading should be freely given "when justice so requires." That means "the district court must be able to determine whether 'justice so requires,' and in order to do this, the court must have before it the substance of the proposed amendment." *Roskam*

*Baking Co., Inc. v. Lanham Machinery Co., Inc.*, 288 F.3d 895, 906 (6th Cir. 2002) (citation omitted). "[A] bare request in an opposition to a motion to dismiss – without any indication of the particular grounds on which amendment is sought – does not constitute a motion within the contemplation of Rule 15(a)." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quotation omitted); *see also* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

The request for leave to amend the complaint fits this description exactly. The Claimants ask for leave to amend in the event "the Court believes that more specificity is needed to plausibly" state a claim for relief. (ECF No. 14, PageID.352; *see also id.*, PageID.356). But nowhere do they propose the specific factual amendments that would support their entitlement to relief. Because the Claimants "submitted none of th[e] facts to aid the court in deciding whether justice require[s] the court to grant leave to amend," their request for such relief must be denied. *Roskam Baking*, 288 F.3d at 906. Accordingly,

IT IS ORDERED that BCBSM's motion to dismiss the complaint (ECF No. 12) is granted.

Dated: November 12, 2026

s/ Robert J. White
Robert J. White
United States District Judge